IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JIMMY H. McCORMICK         )
                                     )
      Plaintiff              )
                                     )     Case No: 4:09-CV-2
v.                                )     MATTICE/CARTER
                                     )
MICHAEL J. ASTRUE,         )
      Commissioner of Social Security   )
                                   )
      Defendant            )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382. This matter was referred to

the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil

Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion

for Summary Judgment (Doc. 14) and defendant's Motion for Summary Judgment (Doc. 16).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff was forty-nine years old on October 14, 1999, when he alleges he became

disabled, and fifty-seven years old at the time of the November 6, 2007, decision, making him a

younger person at the time of his alleged onset, a person closely approaching advanced age as of

1

February 4, 2000 (Plaintiff's 50th birthday), and a person of advanced age as of February 4, 2005 (Plaintiff's 55th birthday), under the Commissioner's regulations (Tr. 139). <u>See</u> 20 C.F.R. §§ 404.1563(c), 416.963(c). The ALJ found that Plaintiff had a limited education under the regulations, meaning having an ability in reasoning, arithmetic, and language skills, but not enough to allow the performance of the more complex job duties needed in semi-skilled or skilled jobs, and generally having a formal education between the seventh and eleventh grade levels (Tr. 27). 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). Plaintiff had past relevant work experince in auto body repair and as a road roller operator in road construction (Tr. 27,1221). *See* 20 C.F.R. §§ 404.1565, 416.965.

### Applications for Benefits

Plaintiff filed this action for judicial review of the final decision of the Commissioner that Plaintiff is not entitled to disability insurance benefits and supplemental security income under the Social Security Act (the Act), 42 U.S.C. §§ 416(I), 423, 1381a, and 1382c(a)(3), prior to March 31, 2001 and continuing through February 4, 2005, the date on which the ALJ found Plaintiff disabled on the date he attained the age of 55 (Tr. 21).

Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging he became disabled on October 14, 1999 (Administrative Record (Tr.) 21). The state agency that makes disability determinations for the Commissioner (*see* 20 C.F.R. §§ 404.1503, 416.903 ) denied Plaintiff's applications, and Plaintiff requested a hearing (Tr. 103-04). Following a hearing, Administrative Law Judge (ALJ) Thomas Givens issued a decision, finding Plaintiff not disabled prior to April 23, 2002, based on the Title II application but finding Plaintiff to be disabled based on the title XVI application filed on April 23, 2002 which disability

2

was found to continue through at least the date of the decision (Tr. 79-86). The Appeals Council, however, vacated the decision, remanding the case for further consideration and a new decision (Tr. 64-67).

On August 21, 2007, Plaintiff testified at a second hearing before ALJ Douglas Kile (Tr. 1217-35). Plaintiff's daughter and a vocational expert also testified (Tr. 1235-46). On November 6, 2007, the ALJ issued a new decision, finding that, prior to February 4, 2005 (Plaintiff's 55th birthday), Plaintiff was not disabled because he retained the ability to perform a limited range of light work and a significant number of jobs accommodated Plaintiff's abilities, limitations, and vocational profile (Tr. 21-29). The Appeals Council, thereafter, denied review of the ALJ's decision (Tr. 9-11), making the November 6, 2007, decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

### Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience.

3

*Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted). The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After consideration of the entire record, the ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2001.

4

2.  The claimant has not engaged in substantial gainful activity since October 14, 1999, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following "severe" impairments: multi-level degenerative disc disease at the L4-5 and L5-S1 levels in the lumbar spine with only mild stenosis; degenerative disc disease at the C6-7 level in the cervical spine without cord compression; mild degenerative joint disease of the pelvis; mild degenerative changes of the right shoulder; osteoarthritis of the first metacarpal joint in both thumbs; a reported history of Hepatitis C in remission; and a post traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.  After careful consideration of the entire record, the undersigned finds that at all times relevant through the date of this decision, the claimant has had the residual functional capacity to perform light work except he cannot work in exposure to "excessive" vibration; he should not perform "frequent" overhead motions; he is limited to jobs that only require dealing with simple instructions and tasks; he is unable to "frequently" operate foot controls; and he should not perform work that requires "frequent" contact with the general public.

6.  At all times relevant the claimant has been unable to perform his past relevant work as an autobody repairman, and a road roller operator, consistent with the testimony of the impartial vocational expert  (20 CFR 404.1565 and 416.965).

7.  The claimant was born on xxxxx xx, 1950 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  He is presently 57 years of age, or a person considered to be of "advanced age" (20 CFR 404.1563 and 416.963).

8.  The claimant has a 9th grade, or "limited" education and he is able to communicate in English (20 CFR 404.1564 and 416.964).

5

9. Transferability of job skills is not material to the determination of disability at any time relevant in this case based on the testimony of the impartial vocational expert (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to February 4, 2005, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. Beginning on February 4, 2005, the claimant attained age 55, and Medical-Vocational Rule 202.02 directs a conclusion of "disabled," considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 404.1560 (c), and 404.1566, 416.960(c), and 416.966).

12. Beginning on February 4, 2005, if the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "disabled" would be directed by Medical-Vocational Rule 202.02. Consequently, the claimant has not been able to make a successful vocational adjustment to work that exists in significant numbers in the national economy. A finding of "disabled" is therefore appropriate under the framework of the above-cited rule.

13. The claimant was not disabled prior to February 4, 2005, but became disabled on that date, and has continued to be disabled through the date of this decision (20 CFR 404.1520 (g) and 416.920(g)).

(Tr. 23-28).

## Issues Presented

Plaintiff raises the following five issues:

1) The ALJ's decision is not supported by substantial evidence because he failed to consider the decisions of the Veteran's Administration, regarding the Plaintiff's impairment.

2)  The ALJ's decision is not supported by substantial evidence because he misconstrued the medical evidence of record to find the Plaintiff was not prescribed the use of a cane for assistance in ambulation.

3)  The ALJ erred as a matter of law in failing to follow the proper analysis of the Plaintiff's mental Residual Functional Capacity.

4)  The ALJ erred, as a matter of law, in failing to perform the proper evaluation of the Plaintiff's complaints of pain and his determination of a less than severe pain is not supported by substantial evidence.

5)  The Commissioner failed to carry his burden to demonstrate the Plaintiff is capable of performing a significant number of other jobs within the Claimant's Residual Functional Capacity.

For reasons that follow, I conclude there is substantial evidence to support the ALJ's conclusion Plaintiff was not disabled until February 4, 2005.

### Relevant Facts

*Testimony of Plaintiff*

At the August 21, 2007, hearing, Plaintiff testified he suffered military service-related disabilities involving his neck, nerves, and acid reflux and that he received a VA rating adding up to one-hundred percent disability (Tr. 1221).  He testified he had previously performed road construction and auto body work but had stopped working in the late 1990s because of severe pain in his neck, back, and shoulders (Tr. 1221, 1227-28).  He said his co-workers helped him with some of the physical demands of his jobs, including helping him on and off machinery (Tr. 1228).

He stated arthritis and carpal tunnel caused spasms in his hands and numbness in fingers and that hepatitis C caused him to have pain in his feet (Tr. 1222-24).  He also testified about his experiencing pain in his lower back and legs (Tr. 1223).  As a result, he said he had problems

7

holding objects; at times could not open a Coke bottle; and, when in a seated position, had to crawl and pull himself up to a standing position (Tr. 1224-26). He also stated he could not stand for more than ten to fifteen minutes (Tr. 1225). He further testified to problems with memory and concentration and to receiving treatment for post traumatic stress disorder (Tr. 1230, 1232).

Plaintiff said he did not drive, shop, cook, or perform household chores (Tr. 1230-31). He also denied any hobbies (Tr. 1233). He said heating pads, a TENS unit, and pain medication helped but not "100 percent" (Tr. 1233). He stated he used a cane on a regular basis and that, because his pain medications caused sleep problems, he would lie down multiple times during the day (Tr. 1233-34).

*Testimony of Plaintiff's Daughter*

Plaintiff's daughter, with whom Plaintiff lived, testified Plaintiff did "nothing" (Tr. 1236). She said Plaintiff did no housework and slept most of the day (Tr. 1236-37).

*Medical Evidence*

Diagnostic testing of Plaintiff's back and neck throughout the relevant time period revealed normal to mild findings. Testing in July 2000 showed no spondylosis or bony destruction and revealed only minimal narrowing at L5-S1, raising the possibility of early degenerative disc disease (Tr. 479). A November 2000 MRI was unremarkable and showed no or only minor abnormalities. These findings included at L4-L5, mild to moderate bilateral articular facet hypertrophy, minor central stenosis and minor bilateral neural foraminal narrowing; at L5-S1, minimal posterior annular disc bulge, minor bilateral articular facet hypertrophy with no central stenosis and minor bilateral neural foraminal narrowing (Tr. 478). Diagnostic testing in January 2001 was normal and unremarkable, except for a degenerative

8

change noted at C6-7, as compared to earlier testing where Plaintiff was diagnosed as having a minor abnormality (Tr. 475-76). A May 2002 MRI showed minor abnormalities, but no significant disc bulge, herniation, or stenosis; Plaintiff was diagnosed with degenerative disc disease of the lower back and neck (Tr. 414, 432). Testing in February 2003 showed mild degenerative disc disease with minimal narrowing; Plaintiff was again diagnosed as having a minor abnormality (Tr. 786). Further testing in April 2003 showed mild degenerative disc disease at C3-4 (Tr. 362). A June 2004 x-ray of the wrist showed mild degenerative changes at the first metacarpal trapezium with some sclerosis and minimal periarticular osteophytes. The impression was, no acute pathology and mild degenerative changes to the lateral aspect of the wrist (Tr. 666).

Notes from Dr. Huddleston, a physiatrist[1] with the VA, and others show that during the relevant time period Plaintiff was treated for chronic neck and back pain. In June 2000, Plaintiff was treated for dizziness caused by his medications (Tr. 380). At that visit, Plaintiff "requested" a back brace and TENS unit to treat his back pain, and "his requests were granted" (Tr. 380). A few days later, Plaintiff was "issued and instructed on use of a cane" and referred for physical therapy for gait deviation; his physical therapy program was to include heat, massage, and a progressive exercise program (Tr. 380). The same day, Dr. Huddleston noted that Plaintiff "ambulates independently without device with a slow pace due to back pain" (Tr. 384). Dr. Huddleston's examination of Plaintiff revealed normal strength and negative straight leg testing,

---

[1] A physiatrist is a medical doctor who specializes in injuries and illnesses involving nerves, muscles, and bones that affect movement. American Academy of Physical Medicine and Rehabilitation, http://www.aapmr.org/condtreat/what.htm (last visited January 16, 2010)(Doc. 17, Plaintiff's Brief, p. 5).

9

and he diagnosed chronic low back pain with x-ray evidence of minor arthritis in the low back and no sign of radiculopathy or myelopathy (Tr. 384). Plaintiff's diagnoses remained unchanged at regular visits through August 14, 2000, at which time Plaintiff's physical therapy was discontinued for lack of success and Dr. Huddleston noted that, as Plaintiff was already using a corset and TENS unit, he had nothing further to offer and recommended re-consultation only on an as-needed basis. Dr. Huddleston noted on physical examination, Plaintiff was a cooperative gentleman in no acute distress. He ambulated independently but with a straight can with a mildly antalgic gait. Staight-leg raising in the lower extremities caused isolated low back pain with no exacerbation with passive dorsiflexion of the foot. Motor strength was normal in the lower extremities. Dr. Huddleston assessed chronic low back pain with mild bulging and continued to find no evidence of myelopathy or clinical evidence of radiculopathy. (Tr. 388).

In a psychiatric/psychological treatment note from October 2000, it was noted Plaintiff used a walking cane "secondary to left knee problems" (Tr. 390). Physical therapy notes from the same month show that Plaintiff was seen as a walk-in, requesting a new corset after having gained weight; a new, larger corset was issued and notes indicate "no further treatment required" (Tr. 390).

In a February 2001 note dictated by Dr. Huddleston, Plaintiff complained of numbness in his right hand and arm (Tr. 726). A normal EMG and nerve conduction study of the right upper extremity, except for decreased voluntary recruitment in the abductor pollicis brevis which was felt to be due to pain from the needle stick versus old injury from deep laceration. Physical exam revealed a gentleman in no acute distress ambulating independently without device, with functional active range of motion, with no muscle atrophy. (Tr. 727, 728).

10

A nurse noted in April 2002 that Plaintiff, in response to a questionnaire, stated that he had problems with mobility but already had a cane (Tr. 409). In a visit of May 17, 2002 Plaintiff was seen by Dr. Dharapuram Venugopal, who assessed low back and cervical neck pain and observed that diagnostic testing showed no significant changes from two years earlier (Tr. 415) Dr. Huddleston saw Plaintiff again on May 20, 2002. He assessed no significant disc bulge/herniation, central stenosis, or foraminal stenosis. He stated he had nothing further to offer and would see Plaintiff as needed (Tr. 414). In a May 2002 consultation with a rheumatologist, Plaintiff reported stiffness and swelling in his hands, foot pain, and stiffness from sitting; osteoarthritis was suspected (Tr. 417-19). Rheumatology notes from November 2002 state that Plaintiff was "[t]hought to have osteoarthritis" and complained of neck and back pain but that testing showed normal neck and mild degenerative changes in the lower back; Plaintiff was instructed in stretching and strengthening exercises for his neck and back (Tr. 444). Psychiatric/Psychological notes from December 2002 state that Plaintiff ambulated with a cane as a result of leg and back injuries during active duty (Tr. 446). Physiatrist notes from February 2003 state that Plaintiff complained of numbness in his arms and fingers and of neck pain but that prior testing of the arms and neck were normal and unremarkable, save for some degenerative joint changes (Tr. 451). Plaintiff reported treating with medication, heat, and cold (Tr. 451). He was advised to use his TENS unit and referred for physical therapy (Tr. 452). That same month, Plaintiff was issued a neck brace (Tr. 454). Rheumatology notes from March 2003 notes complaints of chronic neck and back pain. An MRI of the lumbar spine showed mild degenerative changes and C-spine films show mild degenerative changes. Plaintiff reported no success with physical therapy. On exam he appeared to be generally a healthy-appearing man

11

who hardly moved his neck and was wearing a corset, however, testing showed only mild degenerative changes in Plaintiff's neck. Plaintiff was advised to use heat or cold, prescribed codeine, and directed to return in nine months (Tr. 463, 464). In May 2003, Plaintiff treated with Dr. Lalonde for headaches. Dr. Lalonde noted that there was no evidence of radiculopathy or myelopathy (Tr. 361).

In February 2004, Plaintiff treated again with Dr. Huddleston, who noted that Plaintiff had constant low back pain, which Plaintiff rated, on average, at five to six out of ten and, when flaring, at ten of ten (Tr. 1004). Dr. Huddleston observed that Plaintiff was in no acute distress and noted that Plaintiff's "[g]ait was independent without device" (Tr. 1004). Following an examination, Dr. Huddleston found no evidence of lumbar radiculopathy or carpal tunnel syndrome. He noted range of motion to be approximately 50% restrictd with no tenderness to palpation in the lumbar spine. Straight leg raising was negative bilaterally, Motor strength was normal in both upper and lower extremities (Tr. 1004). Dr. Huddleston instructed Plaintiff on shoulder range of motion exercises, encouraged him to continue daily low back exercises, and directed him to re-consult on an as-needed basis (Tr. 1005). At a January 2004 rheumatology visit, Plaintiff, described as having relatively mild degenerative joint disease of the neck and back, complained of pain in both thumbs and his right shoulder (Tr. 1012).

*Mental*

In June 2000, Plaintiff was admitted to the Alvin C. York Veterans Affairs Medical Center for a one-week stay, complaining of depression, nightmares, and problems with anger control (Tr. 489). He was described as logical and goal directed with a dysphoric mood and some paranoid ideations (Tr. 491). Plaintiff was diagnosed with post traumatic stress disorder

and bipolar, treated with medication, including a Valium taper, and discharged in stable condition, with no overt pychotic symptoms, with significantly decreased PTSD symptoms and no suicidal or homicidal ideations. Plaintiff reported the medications helped (Tr. 489, 492). On discharge, Plaintiff was assigned a Global Assessment Functioning (GAF) score of 55[2] (Tr. 489).

Two years later in August 2002, at an initial psychiatric evaluation at the Veterans Affairs Medical Center in Nashville, Plaintiff was evaluated in an "update examination" for his post traumatic stress disorder (Tr. 424-25). The evaluator noted that Plaintiff did not maintain his scheduled psychotherapy appointments in 2001 and 2002, after having received nine treatment sessions in 2000 (Tr. 426). Plaintiff asserted many stressors related to his Vietnam service (Tr. 427). He reported extreme anger management problems, easy startling, having no friends, and feeling anxious around others (Tr. 428-29). Plaintiff was described as alert and oriented with unimpaired attention and concentration but as looking fatigued and having a flat, blunted affect (Tr. 429). He was found to meet the criteria of post traumatic stress disorder, having severe symptoms, including nightmares, sleep disturbances, and poor functioning (Tr. 429). Dr. Hagood, a staff psychologist, assigned a GAF score of 45[3] and noted his prognosis for improvement was poor (Tr. 430).

---

[2] A GAF of 51-60 indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2003).

[3] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social, occupational, or school functioning (no friends, unable to keep a job). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2003).

13

By late 2002, a VA psychologist assigned Plaintiff a GAF score of 60, indicating moderate symptoms, and noted Plaintiff was alert and oriented with a euthymic mood (Tr. 442). Plaintiff continued to treat with VA psychologists into 2003 and 2004, during which time he was generally assigned GAF scores in the 50-55 range, indicating moderate to serious symptoms (Tr. 856, 867, 999-1000, 1013-14). By early to mid 2005, Plaintiff reported that he was doing well, denied post traumatic stress disorder symptoms, including flashbacks and nightmares, and was assigned GAF scores in the 55-65[4] range, indicating mild to moderate symptoms (Tr. 1044, 1049-52). On July 18, 2005 he was assessed as having a GAF of 50 (Tr. 1049) but his score rose to 55 by October, 3, 2005 (Tr. 1044)..

## Opinion Evidence

*Physical*

In September 2003, Dr. Blevins examined Plaintiff at the request of the state disability service (Tr. 548-50). Dr. Blevins noted Plaintiff used a back and neck brace and a cane (Tr. 549). Dr. Blevins found normal reflexes, abnormal gait and station, and a stiff limp (Tr. 549).

In October 2006, Dr. Lorber reviewed the record and noted that Dr. Huddleston found Plaintiff to have a normal gait without use of a cane (Tr. 1099). He concluded the medical evidence did not support Plaintiff's allegations and determined that Plaintiff could lift up to twenty-five pounds and could occasionally crawl and climb ropes, ladders, and scaffolds but could frequently reach, handle, finger, feel, balance, kneel, crouch, and stoop (Tr. 1107-09).

---

[4] A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, having some meaningful personal relationships. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2003).

*Mental*

In August 2003, Dr. O'Brien conducted a psychological consultative examination at the request of the state disability service (Tr. 541-47). Dr. O'Brien noted some inconsistencies with Plaintiff's self-reported history to the VA and his presentation at the evaluation, observing that Plaintiff smiled and laughed appropriately throughout the examination (Tr. 541). Dr. O'Brien further noted no startled responses despite several loud noises during the examination (Tr. 542). Dr. O'Brien also concluded that Plaintiff's reports of isolation since Vietnam were inconsistent with his work history and his admission that his coworkers helped him on the job (Tr. 542). Dr. O'Brien assessed Plaintiff as having post traumatic stress disorder but found him not significantly limited in his ability to sustain concentration and persistence, remember simple instructions, work with others, and make plans independently. He concluded Plaintiff was able to communicate and interact in an acceptable manner (Tr. 546).

*Testimony of the Vocational Expert*

In a series of hypothetical questions, the ALJ asked the vocational expert to consider a hypothetical individual of Plaintiff's age and with Plaintiff's education and work experience who was limited to light work[5] (Tr. 691-92). The ALJ additionally asked the vocational expert to assume that the individual had various impairments, including back and neck problems, carpal tunnel, and post traumatic stress disorder (Tr. 1239-41). The ALJ asked the vocational expert to assume that the individual could follow only simple job instructions and could not perform any

---

[5]    Light work requires lifting no more than twenty pounds, frequent lifting or carrying up to ten pounds, a "good deal" of walking or standing, and, if it involves sitting most of the time, "some" pushing or pulling. 20 C.F.R. § 404.1567 (b). Generally, it requires intermittent sitting, occasional stooping, and six hours of standing or walking in an eight-hour day. Social Security Ruling 83-10, 1983 WL 31251 *5.

15

overhead lifting, handle excessive vibration, or frequently operate foot controls or have contact

with the public (Tr. 1239-41).  The vocational expert testified that such a person could perform

light work as a sorter (800 jobs in the region), assembler (3,300 jobs in the region), and inspector

(900 jobs in the region) (Tr. 1241).  The vocational expert testified that the additional limitation

of a sit/stand option would reduce the number of jobs identified by sixty to seventy percent (to

approximately 1,500 to 2,000 jobs total), and that, if the additional restriction of use of a cane

were added, all the jobs identified would be eliminated (Tr. 1243).  The vocational expert further

testified that his testimony was consistent with the information contained in the *Dictionary of

Occupational Titles* (Tr. 1246).

## Analysis

### *The Veterans Administration Decision*

Plaintiff first argues the ALJ's decision is not supported by substantial evidence because

he failed to consider three decisions of the Veteran's Administration.  The first decision is dated

April 1, 2004 (Tr. 1086-1088), the second July 8, 2004 (Tr. 1089-1091), and the third, January

21, 2005 (Tr. 1092-1096).

Plaintiff argues that the ALJ "ignore[d]" the VA's disability decision (Doc. 15, Plaintiff's

Brief, p. 11).  As Plaintiff notes, the decision of another governmental agency is not binding on

the Commissioner.  20 C.F.R. §§ 404.1504, 416.904.  This is because any determination by the

VA that Plaintiff is disabled is based on its rules and is not a decision based on social security

law.  As the Commissioner argues, the Commissioner must make a disability decision based on

social security law.  Therefore, the VA's determination is not binding on the Agency.  However,

the Commissioner must at least consider the VA's disability determination. *See, e.g., McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir.2002). In the Sixth Circuit the findings of another governmental agency are relevant and must be considered when they are supported by substantial evidence. See *Jenkins v. Gardner,* 430 F. 2d 243 at 305 (6th Cir, 1070).

In this case the ALJ does not specifically address the decisions of the Veteran's Administration in his opinion although he notes regular treatment by the VA:

> The record shows that the claimant is followed regularly at the Veterans Administration and a local mental health clinic for treatment of post traumatic stress disorder from his experiences in Vietman. They reflect that the claimant's post traumatic stress disorder is well managed with counseling and medication. The consultative psychologist similarly noted that the claimant was fully alert and oriented (Exhibit B-11F). He laughed and smiled throughout the interview. In session, the claimant displayed a wide range of affect, and freely talked about traumatic past events. His mood was euthymic and his affect was congruent with his mood. His thought processes were well organized and goal directed, and there were no overt signs of delusions or hallucinations. The claimant also demonstrated good judgment and insight. Intelligence tests, the WAIS-III, were administered to the claimant post-remand, and they revealed that he functions in the low average range of intelligence with a verbal IQ of 87, a performance IQ of 89, and a full scale IQ of 87 (Exhibit B-33F). Thus, the uncontradictory evidence reveals that the claimant's post traumatic stress disorder is stable with counseling and medication.

(Tr. 26-27).

However, the ALJ explicitly inquired about Plaintiff's VA disability rating at the August 21, 2007, hearing, showing the ALJ did not "ignore" the VA's determination but was aware of it. He specifically asked about it at the hearing (Tr. 1221). Since the ALJ specifically inquired about the Veterans Administration findings, I conclude he considered all of the evidence before him and simply came to his own conclusion as to the residual functional capacity of Plaintiff.

17

(See *McCormick v. Shalala,* 872 F. Supp. 393, E.D. Michigan 1994, where the District Court affirmed the ALJ's determination under similar circumstances).

*The Use of a Cane*

Next Plaintiff argues the ALJ's decision is not supported by substantial evidence because the ALJ found Plaintiff was not prescribed the use of a cane for assistance in ambulation and further argues the ALJ misconstrued the medical evidence of record in finding a cane was not prescribed (Doc 15, Plaintiff's brief at p. 11). Plaintiff points to regulations of the Veterans Administration indicating the "issuing" of a cane is the functional equivalent of prescribing and further points to multiple places in the record where treatment notes indicate plaintiff had a cane (Doc 15, Plaintiff's brief at p. 12).

The Commissioner responds arguing the evidence supports the ALJ's finding, noting at the time the cane was "issued," Plaintiff had requested various devices from Dr. Huddleston. Dr. Huddleston's notes show, at about the same time, Plaintiff requested a TENS unit and back brace and that his "requests were granted" (Tr. 26, 380). The June 2000 note states the cane was "issued" and that Plaintiff was instructed on its use (Tr. 380). The real question is whether Plaintiff requires a cane to walk. The Commissioner argues Plaintiff has not pointed to any assertion by Dr. Huddleston that Plaintiff required a cane to walk and further argues, the very day the cane was issued, Dr. Huddleston observed that Plaintiff did not require a cane or any other device to walk, noting that Plaintiff "ambulates independently without device with a slow pace due to back pain" (Tr. 384). Again, in a note of February 21, 2001, Dr. Huddleston refers to Plaintiff as a gentleman in no acute distress ambulating independently without device with

functional active range of motion with no muscle atrophy (Tr. 727). In February 2004, four years

later, Dr. Huddleston reiterated his opinion that Plaintiff could walk without a cane (Tr. 26,

1004). Although Plaintiff points to the record which contains "[n]umerous examples of

[Plaintiff's] use of his issued cane, for ambulation," the Commissioner argues that Plaintiff's use

of a cane for ambulation and providers remarks on that fact are not the same as Plaintiff needing

a cane. Despite observations that Plaintiff uses a cane and Plaintiff's own claim that he requires

a cane, Dr. Huddleston, the doctor who issued the cane, declared, at the time of the cane's

issuance, some eight months later and then four years later, that Plaintiff did not require a cane to

walk but could ambulate without device (Tr. 26, 384,727,1004). Based upon the evidence,

particularly the observation of the issuing doctor, Dr. Huddleston, I conclude it was reasonable

for the ALJ to reach the conclusion Plaintiff did not require a cane to walk and therefore, to omit

that finding from his residual functional capacity determination, thus rejecting any opinion

evidence to the contrary. I further conclude the ALJ had no duty to re-contact Dr. Huddleston.

Dr. Huddleston declared more than once that Plaintiff did not require a cane to ambulate (Tr. 26,

384, 1004). I conclude this provides substantial evidence to support the finding of the ALJ.

_____*Plaintiff's Mental Residual Functional Capacity*

Plaintiff next asserts that the ALJ failed as a matter of law to properly analyze Plaintiff's

mental residual functional capacity. However, as will be discussed below, his argument relates

to the weight the ALJ gave to the various findings and opinions related to his mental health care

and treatment.

19

The ALJ found Plaintiff had post traumatic stress disorder (Tr. 23).  In finding he did not have an impairment that met the listing, he analyzed his condition and appropriately addressed his condition as it related to the "B" and "C" criteria as follows:

> In addressing the "B" and "C" criteria of the Psychiatric Review Technique Form, the undersigned finds that the claimant's mental impairments result in not more than "mild" limitations in the activities of her [sic] daily living, as demonstrated by the variety of daily activities he reported he performs: not more than "mild to moderate" limitations in his ability to maintain social functioning, as he asserted that he does not like to be around others; not more than "mild to moderate" difficulties in his ability to maintain concentration, persistence, and pace, as the evidence shows that he is able to concentrate on simple and low level detailed instructions and tasks, but cannot maintain concentration, persistence and pace on highly detailed or complex instructions and tasks; and the claimant has "no" episodes of decompensation for extended periods of time. None of the "C" criteria are applicable to the claimant.

(Tr. 24).

Plaintiff points to the treatment for symptoms of Post Traumatic Stress Disorder by the Veteran's Administration since discharge from military service in 1971.  In particular he refers to significant episodes of Post Traumatic Stress Disorder in June, 2000 when his symptoms were noted as depression, a question of bipolar disorder as well as an exacerbation of his Post Traumatic Stress Disorder (Doc 15, Plaintiff's brief, p. 15) and to an  August 15, 2002 treatment where his Post Traumatic Stress Disorder symptoms were again noted as severe, by his V.A. physicians (Tr. 430).  However, in a July 3, 2000 psychiatric treatment team note,  Dr. Challa comments,  meds were helping him, he reported good sleep and decrease in nightmares.  He was more stable and felt good and denied any problem with current meds.  He was assessed as stable (Tr. 381).  Further, in the August 20 treatment notes related to the August 15, 2002 treatment, psychological testing was performed.  The results suggested Plaintiff may have exaggerated his

symptoms to some degree, and may have minimized his use of alcohol and drugs. Although some distortion may have occurred, the doctor concludes the pattern of responding did not necessarily indicate a level of distortion that would render the test results un-interpretable. As such he concludes the results are valid for cautious interpretation.

Plaintiff argues the treating source evaluations have consistently supported at least moderate limitations in ADLs for the relevant time periods including the date last insured of March 31, 2001. He points to the ALJ's hypothetical question to vocational expert, Bradford, at the 2007 hearing included only "...an inability to learn, understand and carry out more than simple job instructions...and an inability to handle frequent contact with the general public (Tr. 1249), arguing these restrictions are not supported by the treatment notes of the Veteran's Administration's treating psychiatrist for the period of time including March 31, 2001 which included an episode of de-compensation lasting from June 26 through July 4, 2000. In particular, Plaintiff points to the period of time from June 26, 2000 through September 11, 2001 when GAF scores ranged from a low of 35 to a high of 55. During this period of time Plaintiff argues these scores indicated limitations ranging from moderate to severe, instead of the mild to moderate found by the ALJ in 2007 (Doc. 14, Plaintiff's Brief, p.15).

The Commissioner takes a different view pointing to the analysis of the ALJ which discussed in detail the VA records which show Plaintiff's post traumatic stress disorder was well managed with counseling and medication (Tr. 27). For example, Plaintiff's August 2002 examination— at which time he was assessed as having serious symptoms— came on the heels of having failed to maintain psychotherapy appointments in 2001 and 2002 (Tr. 426). The record shows that with regular treatment Plaintiff's GAF scores steadily climbed up through February 4,

2005, the date the ALJ determined Plaintiff became disabled, demonstrating only mild to moderate symptoms (Tr. 27, 1044, 1049-52). I agree with the Commissioner that the isolated GAF scores cited by Plaintiff in the 30-50 range are exceptions to Plaintiff's general improvement over time with regular treatment (Doc 15, Plaintiff's Brief, p. 15).

The ALJ also relied on other evidence of record, the expert opinion of Dr. O'Brien, who conducted a consultative exam on August 16, 2003. Although he found no significant evidence of malingering or exaggeration he found inconsistencies between his self-reported history and the VA Medical Center psychiatric notes. Dr. O'Brien noted Plaintiff smiled and laughed appropriately throughout the course of hte evaluation which was inconsistent with previous documentation of a continuous restricted range of affect. He further noted the inconsistency of Plaintiff's 20 years in an occupation and his requiring frequent assistance of other to help him with physical problems. Self-reported history of hypervigilant-type symptoms were not observed by Dr. Oz"brien. He noted Plaintiff showed no startle response when several loud noises were heard. Nevertheless, Dr. O'Brien acknowledged Plaintiff's anxiety depression and PTSD-type symptoms, he merely questioned the intensity of those symptoms (Tr. 451, 452). He found Plaintiff not significantly limited in his ability to sustain concentration and persistence, remember simple instructions, work with others, and make plans independently, socially interact in an acceptable manner and be aware of normal hazards in the work/household setting (Tr. 27, 541-546).

Based on the entire record before the ALJ I conclude he analyzed the conflicting evidence as it related to Plaintiff's mental condition and did not fail as a matter of law to properly analyze his condition. The ALJ's conclusions are supported by substantial evidence.

22

_____*Pain Evaluation*

Next, Plaintiff argues the ALJ failed to perform the proper evaluation of the Plaintiff's complaints of pain and thus his determination of a less than severe pain is not supported by substantial evidence. Plaintiff points to SSR 96-7 which provides the basis for review of the Plaintiff's complaints of pain and his credibility. In determining the Claimant's credibility and degree of pain, the ALJ is required to consider the following:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

Plaintiff concedes the ALJ's decision discusses those requirements. However, Plaintiff argues the ALJ's analysis of these factors presented, in the longitudinal medical history, fails to take into account the numerous attempts by Plaintiff to find relief for his pain.

In response the Commissioner points to the ALJ's discussion at length the diagnostic tests performed during the relevant time period— and that the findings were unremarkable to mild (Tr. 26).

23

Notwithstanding corroborating testimony from Plaintiff's relatives, medical signs and laboratory findings must show the existence of a medical impairment which results from anatomical, physiological, or psychological abnormalities that could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. §§ 404.1529(b), 416.929(b). In this case, the ALJ found the medical findings could not reasonably be expected to produce the pain symptoms alleged (Tr. 26-27).

Assessing Plaintiff's residual functional capacity ultimately rests with the ALJ, and the ALJ's assessment, here, is supported by substantial evidence. *See* 20 C.F.R. § 404.1546(c) and 416.946(c); *Buxton*, 246 F.3d at 772-73 (stating that the ALJ's findings are not subject to reversal merely because there may exist in the record substantial evidence to support a different conclusion... there is a "zone of choice" within which the ALJ can act without the fear of court interference).

### _Error under Drummond_

Plaintiff next argues the Commissioner failed to carry his burden to demonstrate the Plaintiff is capable of performing a significant number of other jobs within the Claimant's Residual Functional Capacity. Because the ALJ found the Claimant cannot perform his past relevant work, the burden shifted to the Commissioner, at step five, to consider his residual functional capacity, age, education and past work experience to see if he can do other work. Plaintiff argues the Commissioner is bound by the 1999 RFC determination, by Judge Nichol (Tr. 1321-1331). *See, Drummond vs. Commissioner,* 126 F.3d 837 (1997). In the prior decision, Judge Nichol found Claimant would require a sit/stand option. As Plaintiff argues, once a

24

plaintiff establishes an inability to perform past relevant work, the burden shifts to the Secretary to prove that the claimant is capable of performing a significant number of other jobs within the claimant's residual functional capacity and consistent with the claimant's age, education, and work experience. *See, Felisky v. Bowen*, 35 F.3d 1027, 1035 (1994)

In this portion of his argument, Plaintiff alleges that the ALJ erred by failing to include limits contained in a 1999 residential functional capacity finding (Doc 15, Plaintiff's Brief, p. 10). Under *Drummond,* where there is no new and material evidence that a claimant's condition changed since the prior finding, the adjudicator is bound, not only by the residual functional capacity finding, but by all required findings from a prior ALJ's decision. Acquiescence Ruling 98-4(6), 1998 WL 283902 at *3. In 1999, an ALJ found this Plaintiff not disabled because he could perform a significant number of jobs, notwithstanding his impairments but in so finding determined he needed a sit/stand option.. The ALJ in the instant case was bound by this finding, absent new and material evidence.

The Commissioner argues the ALJ's residual functional capacity finding is generally consistent with the prior ALJ's finding— both limited Plaintiff to a range of unskilled light jobs. That appears to be so but the 1999 decision included a sit/stand option, and the ALJ noted the sit/stand option in questioning the vocational expert at the August 21, 2007 hearing, asking what effect a sit/stand option would have on the jobs identified; the vocational expert declared that it would decrease the jobs identified by sixty to seventy percent (Tr. 1243). I conclude it is significant that the ALJ had the benefit of six additional years worth of diagnostic testing and treatment since the 1999 decision, and, therefore, significant new and material evidence to justify a slight change in the residual functional capacity finding (i.e., omission of the sit/stand option).

Although the ALJ does not specifically say in his opinion that he finds medical improvement, I conclude it is reasonable that he did in fact find medical improvement since he specifically asked about this additional limitation but decided not to include it in his residual functional findings.

To the extent the ALJ committed any error, the August 21, 2007 hearing makes it clear that the ALJ was aware of the 1999 decision and considered it— and specifically addressed the sit/stand option (Tr. 1243). As the Commissioner notes, the residual functional capacity findings differ only slightly, and the vocational expert testified that the addition of a sit/stand option would merely reduce, but not eliminate, the jobs identified (Tr. 1243). Therefore, considering the number of jobs identified (5,000 jobs total), if the sit/stand option were added, Plaintiff has shown no harm, as, even considering the sixty to seventy percent reduction, the jobs identified by the vocational expert (1,500 to 2,000 jobs total remaining) still satisfy the minimum threshold of "significant." *See Shinseki v. Sanders*, 129 S. Ct. 1696, 1706, 173 L. Ed. 2d 532 (2009) (discussing harmless error); *Hall v. Bowen*, 837 F.2d 272, 273, 275-76 (6th Cir. 1988) (finding that 1,350 jobs is a significant number of jobs). It would only have made a difference if Plaintiff also was required to ambulate with a cane. As set out above, I conclude there was substantial evidence to support the conclusion he did not.

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. In this case, as in many cases, there is evidence to support opposing views. The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in

the record, regardless of whether it has been cited by the ALJ. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. After review of the pleadings and the record, I conclude there is substantial evidence to support the conclusions of the ALJ.

## Conclusion

For the reasons stated herein, I RECOMMEND the Commissioner's decision be AFFIRMED. I further RECOMMEND the defendant's Motion for Summary Judgment (Doc. 16) be GRANTED, the plaintiff's Motion for Summary Judgment (Doc. 14) be DENIED, and this case be DISMISSED.[6] Plaintiff shall continue to receive benefits from February 4, 2005, the date he was found disabled by the ALJ.

Dated:  January 29, 2010                                      *s/William B. Mitchell Carter*
                                                                                  UNITED STATES MAGISTRATE JUDGE

---

[6]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

28